STATE of Missouri, Respondent,

v.

Clifford MILLER, Appellant.

Nos. WD 50202, WD 51692.

Missouri Court of Appeals,
Western District.

Submitted Aug. 20, 1996.

Decided Oct. 1, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 26, 1996.

Application to Transfer Denied
Jan. 21, 1997.

619

Rebecca L. Kurz, Asst. Appellate Defender, Kansas City, for appellant.

Philip M. Koppe, Assistant Attorney Gen., Kansas City, for respondent.

Before HANNA, P.J., and SMART and EDWIN H. SMITH, JJ.

SMART, Judge.

Clifford Miller appeals his conviction, after jury trial, for forcible sodomy, § 566.060, RSMo 1994[1], assault in the second degree, § 565.060, assault in the first degree, § 565.050, kidnapping, § 565.110, and four counts of armed criminal action, § 571.015. Miller was sentenced as a class X offender to consecutive terms of life imprisonment for sodomy and first degree assault charges, fifteen years for the second degree assault charge, twenty-five years for the kidnapping charge, and fifty years for each of the armed criminal action charges. Miller also appeals from the motion court's action in overruling his Rule 29.15 motion for post-conviction relief. In his direct appeal, Miller claims that the trial court abused its discretion in excluding the testimony of defense witness Jimmy Briggs because of defense counsel's late endorsement. Miller claims that Briggs' testimony was crucial to Miller's alibi defense because Briggs was the only unbiased witness that could establish Miller's whereabouts at the time the crimes were committed. Miller, in his appeal of the motion court's denial of his Rule 29.15 motion, claims that the motion court clearly erred because defense counsel was ineffective in his late endorsement of Briggs as an alibi witness. The judgment of the trial court is affirmed. The judgment of the motion court is affirmed.

On June 5, 1992, Angela Hunter left Jimmie's Steakhouse after it closed. Ms. Hunter estimated that she left the bar at approximately 3:20 a.m., but it could have been earlier. As she went out to her car, a man driving a dark Camaro or Trans Am pulled up beside her. The man pointed a gun at her head and told her to get in the car. As she struggled with him, the gun went off and the bullet struck Ms. Hunter in her arm. Ms. Hunter noticed that her attacker was

---

1. All sectional references are to Missouri Revised Statutes 1994, unless otherwise indicated.

wearing a white shirt with silhouettes of bears kissing and green army fatigue pants. The man had a "jerry curl" and a gold tooth.

Ms. Hunter was driven to a house at 2520 Olive. At the house, her attacker ordered her to perform oral sex upon him, keeping the gun pointed at her head. The man told Ms. Hunter to go up the stairs and when they reached the top of the porch he once again forced her to perform oral sex. He then hit her in the head with his gun and left her, dazed and drifting in and out of consciousness. After falling off the porch, Ms. Hunter made her way down the street, naked and bloody, attempting to get help. Eventually, she knocked on the door at 2453 Olive and the person at that house called the police. Ms. Hunter was taken to Truman Medical Center where she remained for two and one-half months. In addition to the gunshot wound in her arm, Ms. Hunter also had a fractured skull, a broken jaw and smashed cheekbones. Police found a blood trail leading to 2520 Olive. No one was apprehended for the crime at that time. Police found a large amount of blood and some woman's clothing, later identified by Ms. Hunter as belonging to her, at the house at 2520 Olive.

Almost a year after her ordeal, on May 21, 1993, Ms. Hunter was persuaded by a friend to go out to the El Capitan. While Ms. Hunter was standing at the bar, a man grabbed her and began talking to her. He said that he had seen Ms. Hunter at Jimmie's. Ms. Hunter recognized the man as her attacker. She asked him what kind of car he had been driving the previous summer and he told her that he had been driving a gray or blue sports car. He also told her that he lived at 25th and Olive. The police were called and spoke briefly to the man who identified himself as Clifford Miller, the appellant in this case. Mr. Miller gave his address as 2454 Olive. Miller was subsequently arrested and tried for the crimes committed against Ms. Hunter.

On June 10, 1993, Ms. Hunter identified Miller as her attacker from a photo array. When questioned by the police, Miller claimed that he had never owned a Camaro. However, investigation showed that two weeks before Ms. Hunter was attacked, Miller was involved in a car accident. He was driving a 1979 Camaro. Confronted with the incident, Miller admitted that he owned the Camaro.

At trial, Miller presented a defense based upon misidentification and alibi. Joseph Lee Willoughby testified that he was with Miller and a group of friends at the Deluxe, a restaurant located at 28th and Brooklyn. He stated that the group left between 2:30 a.m. and 3:00 a.m. and that he knew Miller went home because he had to pass Miller's house in order for him to get to his home. Willoughby stated that Miller was wearing his hair in cornrows and not in a jerry curl on the night in question. He also stated that Miller was driving a brown Impala that evening. Willoughby testified that he and Miller had been friends for twenty-three or twenty-four years but that he had not known that Miller had been arrested and charged with these offenses until the Sunday before trial.

Anthony Wright also testified that Miller was with the group until 2:30 a.m. or 3:00 a.m. on the morning of June 5, 1992. Wright claimed that Miller was wearing his hair in cornrows with beads on the night in question. He also claimed not to have known that Miller had been arrested or charged in this case until the week before the trial.

Velma Chapman, Miller's girlfriend and the mother of his three children, also testified on Miller's behalf. She testified that Miller was wearing his hair in braids and beads at the time in question. She claimed that Miller returned home at about 3:00 a.m. and that she asked him if he had been at Jimmie's because she had heard about a disturbance over the police scanner. He told her that he had not been there. She testified that the two of them went to bed and fifteen to twenty minutes later heard a disturbance reported on the scanner, that a woman had been raped or robbed at 24th and Olive, near where Miller's grandmother lived. She could not recall, however, what she heard on the scanner on any other night she was questioned about. During cross-examination, Chapman admitted that she had earlier told investigators that she did not know what Miller did on the night in question.

The defense attempted to call Jimmy Briggs to the stand. No witness by that name had been disclosed by the defense. The prosecution objected. Defense counsel informed the court that Miller had told him about Briggs only the night before and that he had not spoken to Briggs until that morning. The prosecution was allowed to question Briggs, outside the hearing of the jury, in connection with the motion to exclude Briggs' testimony:

Q. Who came to you to talk to you about a defense in this case?

A. Mr. Miller.

Q. And when was that?

A. He told me he needed me to testify because I told him I didn't want to testify.

Q. When did he tell you that he needed you to testify?

A. It's been a week ago.

\* \* \*

Q. —he came and he said he needed you to testify? Did he tell you what he needed you to testify about?

A. Well, the night of the 5th of '92.

Q. The night of the 5th?

A. Well, of a morning. It was 3:00 o'clock in the morning.

Q. And had you remembered that date?

A. Yes, I did.

Q. Had you spoken to him previously about this date?

A. No.

Q. So this was the first time that you talked to him, a week ago, about that night?

A. Uh-huh.

Q. And how is it, sir, that you're able to remember that night?

A. Because my wife and I, we had a disagreement and she left the 5th and I've never seen her again.

Q. You've not seen your wife since the 5th of June, the early morning hours the 5th of June?

A. Yes.

Q. And when Mr. Miller came to talk to you a week ago you were able to tell him that you remembered that night because your wife left you?

A. Yes. I remember that night because Friday was a working day for me.

Q. Friday was a working day?

A. Yeah, I was up getting dressed for work.

Q. Up getting dressed for work, what time?

A. Well, after I went back in the house I guess I got dressed about 4:00.

Q. About 4:00 o'clock?

A. Uh-huh.

Q. Did you see Clifford at 4:00?

A. No, I didn't.

Q. When did you see Clifford?

A. I saw him at 3:00 o'clock when he was standing in his house.

Q. You saw Clifford at 3:00 o'clock?

A. Yes, I did.

Q. Did you see what—did you see him pull up to come home that night?

A. No, I didn't.

Q. You didn't see him come home that night? You didn't see what kind of car he was driving?

A. No.

Q. Did you see him after 3:00 o'clock standing up in his house?

A. No. I was in the house.

Q. So on that date you saw him for a moment standing at his house at 3:00 o'clock.?

A. Yes.

Q. Do you remember what he was wearing?

A. No, I don't.

\* \* \*

Q. And you got up at 4:00 and went in and got dressed?

A. Yeah.

Q. At 3:00 o'clock after you saw Clifford Miller go in the house did you sit on your porch until 4:00?

A. No. I said I got up and went in the house and got dressed at 4:00. I didn't say I'd set there until 4:00.

Q. Okay, what did you do between 3:00 and 4:00?

A. I drunk coffee.

Q. Drank coffee?

A. Yes, I did.

Q. Where?

A. At my house.

Q. Inside?

A. Yes.

Q. Inside the house?

A. Yeah.

Q. So if I understand your testimony, you saw Clifford Miller at 3:00 o'clock, then you drank some coffee inside your house, and at 4:00 o'clock got ready to go to work?

A. I said I saw Mr. Miller at 3:00 o'clock and he went in his house and I set there until about 3:30 and I went in the house and got dressed at 4:00.

Q. Okay, how long were you on your porch after 3:00 o'clock when you saw Clifford Miller?

A. I just said until 3:30.

Q. So you think you sat out there till 3:30?

A. I know I sat there until 3:30.

Q. Now you live across the street from Clifford?

A. Yes, I do.

Q. Is it directly across the street?

A. No, it's not.

Q. Where is it then?

A. It's four houses—I'm on this side of the street. He's on that side.

Q. Four houses—

A. From the corner.

Q. You're across the street from Clifford Miller and four houses down, is that what you're saying?

A. Yes.

In response to the prosecution objection to allowing Mr. Briggs to testify, defense counsel stated that in the late afternoon of the second day of trial, his client notified him he had "a gentleman ... to bring down." They got together early the next morning before trial and counsel briefly interviewed Mr. Briggs, and then presented him to the prosecution for an interview.

In continuing his offer of proof and his request to allow Briggs to testify, counsel stated:

> Your honor, he was going to testify and has notified under questioning from the prosecutorial team that he was going to testify the morning of June 5th, 1992, he saw the defendant drive up in a brown Impala, get out of his vehicle at approximately 3:00 in the morning, saw some type of lights on in his car. The defendant told him that was an alarm device flashing and that it was setting, and that the defendant went inside and the witness stayed outside for approximately half an hour and did not see Mr. Miller leave through the front door....

The trial court denied the defendant's request to have Briggs testify.

At the conclusion of the evidence, Miller was found guilty by a jury on all counts. He filed a timely *pro se* Rule 29.15 motion for post-conviction relief on April 27, 1995. An amended motion was filed on July 10, 1995. At his post-conviction hearing, Miller testified that Jimmy Briggs and Jimmy Verge were the same person. Miller acknowledged that he gave his counsel the name Jimmy Verge, not Jimmy Briggs. Counsel testified that he and Miller had an arrangement, to hold down the fee, that Miller would "do the leg work ... basically put his defense together and witnesses...." Miller faulted his attorney for not realizing that Jimmy Verge and Jimmy Briggs were the same person, and in failing to point that fact out to the court. After an evidentiary hearing, the motion court denied the motion, finding:

> That trial counsel failed to properly endorse Jimmy Briggs is a direct result of Movant's conduct. Trial counsel testified at the evidentiary hearing that Movant provided the names and addresses of all the witnesses for his defense the week prior to trial. Movant provided the erroneous name of Jimmy Verge to trial counsel. As trial counsel testified at the evi-

dentiary hearing, Movant failed to inform trial counsel that Jimmy Briggs and Jimmy Verge were the same individual. Trial counsel endorsed Jimmy Briggs on the day of his testimony. The State objected to the late endorsement, trial counsel properly made an offer of proof. That Jimmy Briggs was not endorsed is not due to the ineffectiveness by trial counsel. Additionally, the Trial Court ruled Mr. Briggs' testimony was cumulative to other testimony presented by Movant at trial. With this ruling in mind, it is this Court's assessment that Movant was not prejudiced by the lack of Mr. Briggs' testimony....

Miller appeals his conviction and appeals the denial of his Rule 29.15 motion for postconviction relief.

## DIRECT APPEAL

Miller, in Point I, contends that the trial court abused its discretion in failing to accept the late disclosure of defense witness Jimmy Briggs. Miller claims that Briggs' testimony was critical to Miller's defense because Briggs was the only unbiased witness that could establish Miller's whereabouts at the time the crimes were committed.

The record reflects that defense counsel, John Quinn, entered his appearance as Miller's attorney on December 23, 1993. He was served with the State's request for discovery on the same day. On June 2, 1994, four days before trial, the State received a one page pleading, a "Defense Witness List" containing thirteen names. The name of "Jimmy Verge" was among these names, with an address listed at "2708 Olive." Miller did not identify any of the witnesses on the list as alibi witnesses or give notice that he was going to rely upon a defense of alibi. Rule 25.05(A)(5) provides:

If the defendant intends to rely on the defense of alibi and the state in its request specifies the place, date, and time of the crime charged, disclosure shall be in the form of a written statement by counsel for the defendant, announcing such intent and giving specific information as to the place at which the defendant claims to have been at the time of the alleged offense, and, as particularly as is known, the names and

addresses of the witnesses by whom he proposes to establish such alibi.

Although the State was not planning to object to anyone on the list despite its deficiencies, it did object to allowing someone whose name was not on the list to testify.

■ "When a party fails to comply with a discovery rule, the trial court may order disclosure of material and information, grant a continuance, exclude evidence or enter such orders it deems just given the situation." *State v. Massey,* 867 S.W.2d 266, 268 (Mo. App.1993). The trial court, under the authority of rule 25.16, may exclude the testimony of a witness where the identity of that witness was not properly disclosed pursuant to a discovery request. *State v. Harris,* 664 S.W.2d 677, 680 (Mo.App.1984). Sanctions are within the discretion of the trial court. *State v. Wooten,* 735 S.W.2d 30, 31 (Mo.App. 1987). We will reverse where it can be shown that the trial court's action has resulted in fundamental unfairness to the defendant. *State v. Williams,* 815 S.W.2d 43, 49 (Mo.App.1991).

■ Exclusion of an alibi witness is a drastic remedy. *Massey,* 867 S.W.2d at 268. The exclusion is proper, however, when there is no reasonable justification given for the failure to disclose the witness. In *State v. Watson,* 755 S.W.2d 644 (Mo.App.1988), the defendant claimed that the trial court abused its discretion by not allowing him to call two alibi witnesses. The court of appeals, however, held that there was no fundamental unfairness to the defendant in excluding the witnesses. *Id.* at 646. The court pointed out that the defendant offered no reasonable justification for the failure to disclose the witnesses, especially since one of the witnesses was the defendant's aunt and the other was his girlfriend. *Id.* Similarly, in *Harris,* the court held that there was no justification for the late endorsement of witness and that it was "inconceivable" that three alibi witnesses were not discovered until the second day of trial, especially since two of the witnesses were relatives and the third was defendant's girlfriend. *Harris,* 664 S.W.2d at 680–81.

In *Wooten,* the trial court refused to allow the defendant to testify that he was away

from home on the dates he was charged with having sexual intercourse with his daughters at his home because the defendant did not respond to the State's discovery request of his intent to use an alibi defense. *Wooten*, 735 S.W.2d at 31. The trial court's exclusion of the proposed testimony by the defendant was upheld on appeal. The court stated:

> Defendant was aware of the specifics of the charges on November 15, 1985, when the information was handed down; his merely listing as potential witnesses those persons he wanted to use as alibi witnesses could not be expected to apprise the State of his intent to use an alibi defense. The failure to admit the testimony would be an abuse of discretion if it resulted in fundamental unfairness to defendant. *Harris*, 664 S.W.2d at 680–81; *State v. Gooch*, 659 S.W.2d 342, 343[1] (Mo.App.1983). In *Gooch* the court found the exclusion of corroborating alibi testimony to be an abuse of discretion where defendant testified he was with his wife at the time of the crime and defendant's wife was not allowed to corroborate that testimony. The rationale behind the decision in *Gooch* was that because of the court's ruling defendant was in a worse position than if he had not testified. That rationale does not apply to this case.
>
> No reasonable justification was given for the failure to disclose the alibi. The sanction is among those allowed by Rule 25.16, and defendant has not demonstrated fundamental unfairness resulted from the sanction. There was no abuse of discretion.

*Wooten*, 735 S.W.2d at 31.

■ Here, even though Miller says Briggs was disclosed before trial under a different name, neither Miller's attorney nor the court knew, at the time of the ruling, that Briggs had been disclosed under the different name. The court cannot be faulted for not knowing that which it cannot know without being informed. It is the responsibility of the defense to identify the witnesses and to disclose them. The more significant a witness is, the more important it is that the defense be diligent to timely disclose the witness. If the witness is not timely disclosed, some explana-

tion should be given as to why it would be inappropriate to enforce, in the particular instance, the rule requiring disclosure. If there is an explanation offered which tends to show good cause for the nondisclosure, it would likely be an abuse of discretion to exclude a significant defense witness. Here, however, no explanation for Miller's failure to disclose Briggs was provided. The court was never informed that Briggs had been previously endorsed under the name "Jimmy Verge." The sudden appearance of Briggs as a witness on the third day of trial, with no explanation for the failure to disclose earlier, was inconsistent with the concept of good cause for nondisclosure. The trial court did not abuse its discretion in denying Miller's request to endorse Briggs as a witness on the third day of trial. Point I is denied.

## POST–CONVICTION APPEAL

In Point II, Miller argues that the motion court clearly erred because defense counsel was ineffective in his late endorsement of Briggs as an alibi witness. Miller claims that "Jimmy Verge" and Jimmy Briggs were the same person. He says that he told counsel about "Jimmy Verge" two months after he took Miller's case, and that he told counsel that Verge lived at 2708 Olive. Miller claims that if counsel had interviewed "Jimmy Verge" at his house he would have discovered that Verge was Briggs and that he provided an incorrect name on the witness list. Miller claims that he was prejudiced because Briggs was "the only unbiased witness who could establish Mr. Miller's whereabouts at the exact time of the alleged offenses."

Trial counsel, at the post-conviction hearing, testified that he learned about "Jimmy Verge" about a week prior to trial. At the time he was arguing to the court to allow Briggs to testify, he did not know that Briggs and Verge were the same person.

The motion court found:

> That trial counsel failed to properly endorse Jimmy Briggs is a direct result of Movant's conduct. Trial counsel testified at the evidentiary hearing that Movant provided the names and addresses of all the witnesses for his defense the week prior to trial. Movant provided the erroneous name of Jimmy Verge to trial counsel. As trial counsel testified at the evi-

dentiary hearing, Movant failed to inform trial counsel that Jimmy Briggs and Jimmy Verge were the same individual. Trial counsel endorsed Jimmy Briggs on the day of his testimony. The State objected to the late endorsement, trial counsel properly made an offer of proof. That Jimmy Briggs was not endorsed is not due to the ineffectiveness by trial counsel.

■ Appellate review of the denial of post-conviction relief is limited to a determination of whether the trial court's findings and conclusions are clearly erroneous. *State v. Driver*, 912 S.W.2d 52, 54 (Mo. banc 1995). The motion court's findings and conclusions are deemed clearly erroneous only if after reviewing the entire record, the appellate court is left with the definite and firm impression that a mistake was made. *State v. Johnson*, 901 S.W.2d 60, 62 (Mo. banc 1995).

■ Movant, in establishing ineffective assistance of counsel, must satisfy a twoprong test, showing: (1) counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under similar circumstances; and (2) that defendant was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Prejudice is established upon a showing that but for counsel's errors, the outcome of the proceeding would have been different. *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996). Counsel is presumed to have been effective; a movant shoulders a heavy burden in attempting to overcome this strong presumption by a preponderance of the evidence. *Id.* "The benchmark for judging ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *State v. Graham*, 906 S.W.2d 771, 784 (Mo.App.1995).

■ Trial counsel testified he was not supplied with a list of names until the week prior to trial. "Defense counsel necessarily relies on his client to identify witnesses and is not required to be clairvoyant." *State v. Twenter*, 818 S.W.2d 628, 639 (Mo. banc 1991). The evidence indicated that Defendant Miller and his counsel agreed that, in order to hold down the attorney's fees in this case, it would be the responsibility of Miller to investigate the facts concerning the alibi and determine which witnesses should testify. We cannot say, and it is not contended, that such an arrangement, in itself, constitutes ineffective assistance of counsel. The trial court here found that Miller provided counsel with names approximately a week prior to trial, and provided the wrong name, and then failed, at the time of trial, to make clear to his counsel that Verge and Briggs were the same person. The motion court attributed the fault to Miller, and not to his counsel. The record does not leave us with a definite and firm impression that a mistake was made by the motion court.

We hold the trial court was not clearly erroneous in finding counsel was not ineffective. We need not reach the issue of prejudice. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

The motion court did not clearly err in its denial of Miller's Rule 29.15 motion for post-conviction relief. Point II is denied.

The judgment of the trial court is affirmed. The judgment of the motion court is affirmed.

All concur.