**STATE of Missouri, Plaintiff–
Respondent,**

v.

**James R. CRAVENS, Defendant–
Appellant.**

No. 21649.

Missouri Court of Appeals,
Southern District,
Division Two.

April 21, 1998.

Motion for Rehearing or Transfer to
Supreme Court Denied May 11, 1998.

Gwenda R. Robinson, Asst. Public Defender, St. Louis, for Defendant–Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel W. Follett, Asst. Atty. Gen., Jefferson City, for Plaintiff–Respondent.

PARRISH, Presiding Judge.

James R. Cravens (defendant) was convicted, following a jury trial, of murder in the second degree, § 565.021.1(1),[1] and armed criminal action, § 571.015.1. This court affirms.

Lynn Baumgardner and his mother lived across the street from a house trailer where defendant and defendant's girlfriend, Deborah Roy, lived. Lynn's three children, Jonathan, LaDella and Jessica, lived with him and his mother.

Shoynna Klingler and her sons, Kyle and Rodney, were at the Baumgardner residence the afternoon of June 19, 1996. They planned to have a barbecue. During the afternoon, before the barbecue, Shoynna, LaDella, Jonathan and some of the others left the Baumgardner house to pick raspberries. They walked by defendant's house trailer. They could hear voices coming from the trailer, arguing. When they were returning, Shoynna, LaDella and Jonathan heard defendant shout, "You're going to do as I tell you, or you'll be sorry." LaDella and Jonathan looked toward the trailer. The door was open. LaDella saw defendant strike Deborah Roy in the face. Jonathan saw him shove her.

Later that evening, Shoynna, LaDella and Jonathan heard a shout followed by a gunshot. They did not report the incident. Defendant had told the Baumgardners to mind their own business on past occasions.

The next morning, June 20, defendant's truck that had been parked by the trailer was gone. The doors to the trailer were closed with a padlock on the outside of the front door.

Shoynna and her children had spent the night at the Baumgardner house. She left to take her children to her parents' house. She told her father about the shot she heard the night before. He suggested that she report it. Shoynna called the sheriff's department.

A deputy sheriff went to defendant's trailer. He saw the padlock on the door and heard a dog barking and a television playing inside the trailer. No one responded when he knocked on the door and on the back of the trailer. He looked through a window and saw a hand and foot of a person reclining on a bed or sofa in the living area of the trailer. The officer called for assistance and asked for a pair of bolt cutters. Another deputy sheriff came to the trailer. They cut the padlock from the front door and entered the trailer where they found Deborah Roy's body. She had a gunshot wound in the head.

Defendant was observed that morning by a Texas County deputy sheriff on patrol. The deputy saw him standing alongside his pick-

1. References to statutes are to RSMo 1994.

up. The pickup was parked with its headlights burning. After passing by the pickup, the officer turned around. He drove to the pickup. Defendant was inside the truck. The officer asked for identification. Defendant responded with profanity and drove away. The deputy sheriff pursued defendant's vehicle. After a chase, defendant was apprehended. He had an odor of alcohol about his person. He was arrested for driving while intoxicated and resisting arrest.

Texas County authorities were notified that defendant was a murder suspect. They were asked to search for a weapon. The deputy sheriff who arrested defendant found a shotgun in a ditch along the route where he had earlier chased defendant.

Defendant was interviewed by Sgt. Carl Watson of the highway patrol. Defendant initially claimed he did not own a shotgun. He admitted to having argued with Deborah Roy the previous day, but denied knowing anything about her death. Later, he admitted that he owned a shotgun. He said he had struggled with Ms. Roy. He claimed the shotgun went off during the struggle; that he had not intended to kill her.

■ Defendant presents two points on appeal. One is directed to the state's failure to disclose that an expert witness would state the opinion that the gunshot that inflicted the fatal wound was fired from a distance of six to eight feet away from the victim. The other is directed to the trial court "allowing the prosecutor" to make certain statements during the rebuttal portion of the state's closing argument.

No objection was made at trial to the part of the expert witness' testimony or to the parts of the state's closing argument about which defendant now complains. The issues were not preserved for appellate review. *State v. Henderson,* 954 S.W.2d 581, 583 (Mo.App.1997); *State v. Pospeshil,* 674 S.W.2d 628, 632 (Mo.App.1984).

■ Defendant alleges, however, that the trial court "plainly erred" with respect to the issues he now asserts. Rule 30.20 permits this court, in its discretion, to review plain errors that affect substantial rights "when the court finds that manifest injustice

or miscarriage of justice has resulted therefrom" even if the issues were not briefed or not properly briefed.

*Plain error* and *prejudicial error* are not synonymous terms. *State v. Valentine,* 646 S.W.2d 729, 731[4] (Mo.1983). . . . Appellate courts use the plain error rule sparingly and limit its application to those cases where there is a strong, clear demonstration of manifest injustice or miscarriage of justice. *State v. Collis,* 849 S.W.2d 660, 663[1] (Mo.App.1993). The determination of whether plain error exists must be based on a consideration of the facts and circumstances of each case. *State v. Cline,* 808 S.W.2d 822, 824[5] (Mo. banc 1991). A defendant bears the burden of demonstrating manifest injustice or miscarriage of justice. *State v. Harrison,* 864 S.W.2d 387, 389[3] (Mo.App.1993).

*State v. Varvera,* 897 S.W.2d 198, 201 (Mo. App.1995).

■ In Point I defendant contends the trial court erred in denying his motion for new trial because the state "failed to disclose that Dr. David [sic] Anderson, pathologist, would testify at trial that when the fatal shot was fired, the shotgun muzzle was six to eight feet from Ms. Roy's head." Defendant's brief argues that his trial attorney formulated defendant's defense upon information provided by responses to his request for disclosure "that the fatal shot occurred at between zero to three feet."

In responses to defendant's request for disclosure, the state listed Dr. Douglas Anderson of the Pathology Department of St. John's Regional Hospital and Mr. Carl Rothove, criminalist of the Missouri Highway Patrol, as witnesses. Defendant requested the state to disclose persons it intended to call as witnesses "together with their written or recorded statements, and existing memoranda, reporting or summarizing part or all of their oral statements." A further request was made for "[a]ny reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons."

Point I involves Dr. Anderson's testimony concerning what was revealed by test patterns created by test firing the shotgun that was alleged to have been the murder weapon. Carl Rothove testified that he tested the shotgun by firing it at targets from various distances. The test patterns that were revealed on the targets he shot were admitted in evidence.

Dr. Anderson testified next. He autopsied the victim. He was shown the test patterns and asked if any of their characteristics were consistent with the victim's wound. The test patterns he was shown had been fired from one, two, four, six and eight feet. He testified that the test patterns created by firing the shotgun at six feet and eight feet were consistent with the wound he had observed on the victim's body. He was asked the following questions and gave the following answers:

Q. So, in your professional, expert opinion, sir, and in 18 years of pathology, how far would you estimate that the shot was fired to create this wound?

A. Based on what you've—what— Based on what you've shown me, the third to last, the second to last would be the approximate ranges.

Q. That would be between six and eight feet, sir?

A. Yes, sir.

Defendant claimed the shotgun accidentally discharged while he struggled with the victim. He argues that he was prejudiced because he was not provided information that would have permitted him to know the shotgun test patterns would be tied to a specific distance between the muzzle of the shotgun and the victim's head at the time the fatal shot was fired.

The trial court conducted an inquiry at the time defendant's motion for new trial was argued concerning the information the state disclosed to defendant. The prosecuting attorney advised the trial court he did not learn that Dr. Anderson would testify about the distance from which the shot was fired until two or three hours before Dr. Anderson's testimony. During the noon hour of the last day of trial, Dr. Anderson

was shown the test patterns. He concluded that he could state an opinion about the distance from which the gun was fired based upon the test patterns.

Defendant's attorney told the trial court he expected the shotgun test patterns to be offered in evidence, but he did not expect anyone to testify from them concerning the distance from which the fatal shot was fired. He conceded that the prosecuting attorney had no knowledge before trial started that Dr. Anderson could testify about the distance from which the shot was fired.

Defendant filed one written request for disclosure as permitted by Rule 25.03. It sought the information Rule 25.03(A)(1) requires to be provided upon written request, "written or recorded statements, and existing memoranda, reporting or summarizing part or all" of oral statements by persons the state intended to call as witnesses. It also sought the information Rule 25.03(A)(5) requires the state to provide upon written request, "reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons."

There is no showing that there were any written or recorded statements of Dr. Anderson regarding the issue defendant raises in Point I, nor is there a showing of the existence of memoranda that reported or summarized conclusions of Dr. Anderson concerning the distance from which the shot was fired. Rule 25.03(A)(1) was not violated.

If the phrase "reports or statements of experts" in Rule 25.03(A)(5) includes oral statements concerning matters that will be addressed through expert testimony, literal compliance with that rule would have required the prosecutor to notify defendant's trial attorney that Dr. Anderson was prepared to testify about distance between the victim and the muzzle of the gun based on the available test patterns, notwithstanding that the prosecutor learned Dr. Anderson was prepared to testify in that regard a short time before he did so. The state was under a continuing duty to comply with the discovery rule. *State v. Davis,* 556 S.W.2d 45, 47

(Mo. banc 1977). Notwithstanding, failure to comply with discovery does not mandate reversal of a conviction. *Id.* at 47–48. The trial court was required to determine the effect of the noncompliance on the outcome of the case. *Id.*

The record does not indicate that the state's failure to bring the anticipated testimony of Dr. Anderson to defendant's trial attorney's attention was intended to ambush defendant, nor does it reveal that the failure to tell the defense attorney about the anticipated testimony was anything but an unintentional or unthinking omission that occurred during the stress of trial.

Defendant's attorney had knowledge of the test patterns Mr. Rothove fired. He had knowledge that Dr. Anderson performed an autopsy. It is not inconceivable that an interview of Dr. Anderson or his deposition would have produced the information that the prosecutor's noontime conversation with the pathologist revealed.

Furthermore, the case against defendant was strong.[2] He had argued with Deborah Roy throughout the day of her death. There were witnesses who observed defendant push and strike Ms. Roy earlier that day. There was testimony that during the afternoon of the day Ms. Roy was shot, defendant was heard shouting at her that if she didn't do as he said, she would be sorry. Later that evening, shortly before a shot was fired from inside defendant's trailer, three witnesses heard someone scream, "No. No. Don't." The scream was followed by a gunshot.

The failure to disclose the anticipated testimony of Dr. Anderson was presented to the trial court in defendant's motion for new trial. The motion was denied. This court finds no abuse of discretion by the trial court's denial of the motion for new trial. The evidence was sufficient for the trial court to have found the state's failure to disclose Dr. Anderson's anticipated testimony with respect to the test patterns and the fatal wound and the distance from which the shot was fired did not result in fundamental un-

fairness or prejudice to defendant's substantial rights so as to require reversal of his conviction. There was no plain error. Point I is denied.

Point II asserts plain error by the trial court in "allowing the prosecutor" to make various arguments in the rebuttal part of the state's closing argument. In *State v. Wright,* 934 S.W.2d 575 (Mo.App.1996), this court explained:

> In *State v. Silvey,* 894 S.W.2d 662 (Mo. banc 1995), the Supreme Court of Missouri discussed requests for plain error review directed to events occurring during closing arguments. In declining to grant plain error review, the court said:
>
> > Plain error review "should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review." *State v. McMillin,* 783 S.W.2d 82, 98 (Mo.banc 1990) (quoting, *State v. Valentine,* 646 S.W.2d 729, 731 (Mo. 1983)). Relief should rarely be granted on assertions of plain error as to closing argument because, "in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Clemmons,* 753 S.W.2d 901, 907–08 (Mo.banc 1988).
>
> *Id.* at 670.

934 S.W.2d at 584–85.

This court, in *Wright,* declined to grant plain error review to the closing argument question. Consistent with *Wright* and with *Silvey,* the request in this case for plain error review of the issue raised in Point II is denied. The judgment of conviction is affirmed.

MONTGOMERY, C.J., and SHRUM, J., concur.

---

2. An element for consideration is the "closeness" of the case. "[E]rror which in a close case might call for a reversal may be disregarded as harmless when the evidence of guilt is strong." *State v. Degraffenreid,* 477 S.W.2d 57, 65 (Mo. banc 1972). *See also State v. Davis,* 556 S.W.2d 45, 48 (Mo. banc 1977).