**STATE of Missouri, Respondent,**

v.

**Tolliver J. SIMONTON, Appellant.**

**No. WD 58332.**

Missouri Court of Appeals,
Western District.

July 17, 2001.

Irene C. Karns, Columbia, for appellant.

Rachael A. Smith, Asst. Atty. Gen., Jefferson City, for respondent.

Before ELLIS, P.J., LOWENSTEIN and BRECKENRIDGE, JJ.

BRECKENRIDGE, Judge.

Tolliver J. Simonton was convicted by a jury of murder in the first degree, § 565.020, RSMo 2000, for the death of his eight-year old son, Tate Simonton. He was sentenced to life imprisonment without the possibility of probation or parole. At trial, Mr. Simonton asserted the defense of lack of responsibility due to mental disease or defect under § 552.030, RSMo 1994[1]. On appeal, Mr. Simonton claims that the trial court erred when, based upon discovery violations, it excluded the testimony of a psychiatrist, Dr. Bruce Harry, who would have testified that Mr. Simonton's mental illness prevented him from appreciating the nature, quality, and wrongfulness of his conduct. He asserts that there was no discovery violation, but even if there was, the remedy of exclusion was too harsh. Second, Mr. Simonton claims that the trial court erred in excluding the testimony of Dr. Harry with respect to his testimony concerning his diagnosis of and conclusions concerning Mr. Simonton's mental condition as of the date of Dr. Harry's second report to the court in September 1998, which was properly disclosed. Finally, Mr. Simonton argues that the trial court

---

1. All statutory references are to the Revised Statutes of Missouri 1994, unless otherwise indicated.

erred in sustaining the State's objection to defense counsel's rhetorical question during closing arguments. He also claims that the curative instruction given by the court was a misstatement of the law that acted to lessen the State's burden of proof.

In response to Mr. Simonton's claim that the remedy of the exclusion of Dr. Harry's testimony was an abuse of discretion, the State counters that Mr. Simonton presented the testimony of psychiatrist Dr. John Rabun who testified concerning Mr. Simonton's mental state. Dr. Rabun's opinion was that Mr. Simonton was suffering from a mental disease at the time of his son's death and that while Mr. Simonton was aware of the nature and quality of his conduct, he did not know or appreciate the wrongfulness of his conduct at the time he killed his son. The State argues that any testimony by Dr. Harry was cumulative and that the trial court did not abuse its discretion in finding Mr. Simonton was not significantly prejudiced by the exclusion of Dr. Harry's testimony. This court believes that Dr. Harry's testimony was not cumulative, but that Mr. Simonton was significantly prejudiced by the exclusion of Dr. Harry's testimony due to the State's cross-examination of Dr. Rabun which focused on the fact that Dr. Rabun's opinion was only the opinion of one doctor, and he could be wrong. Thus, this court believes that the trial court abused its discretion in disallowing the testimony of Dr. Harry. The judgment of the trial court is reversed and this case is remanded for new trial.

### Factual and Procedural Background

On the morning of Sunday, February 23, 1997, Jeanne Simonton left town to attend a teachers' conference at the Lake of the Ozarks. Her eight-year-old son, Tate, was left in the care of Mr. Simonton, her husband, who was a middle school counselor. The Simontons had been having financial problems, so before she left, Ms. Simonton told Mr. Simonton, "It's going to be okay. Things are going to work out."

Around 5:00 p.m. that evening, Earl Underwood, Ms. Simonton's father, called the Simontons' house to see, among other things, if Tate had received the fifty-cent pieces he and his wife had sent Tate for his coin collection. During the conversation, Mr. Simonton told Mr. Underwood that he was going to fix bacon and eggs, Tate's favorite meal, for Tate that evening. Mr. Underwood also spoke with Tate about the fifty-cent pieces.

Around 9:00 p.m. that evening, Ms. Simonton called home to check in and to give Mr. Simonton her room number and telephone number. She reminded Mr. Simonton that she had laid out Tate's clothes for the next two days and prepared his lunches and placed them in the refrigerator. She also reminded him that she had left a note on a yellow pad which contained all the information he would need while she was away.

The next morning, Monday, February 24, 1997, Ms. Simonton called home a few minutes after 7:00 a.m. as she was waiting for a shuttle to take her to the conference meeting. At that time and when she tried to call a few minutes later, the phone was busy. She then went on to the conference. Around 8:00 a.m., the principal of the middle school where Mr. Simonton worked called the elementary school secretary to see if Tate was in school. After checking with the teacher, she learned that he was not. Sometime later, the school secretary received a call from Mr. Simonton, who informed her that Tate was sick and would not be in school.

When Ms. Simonton returned to her room that evening around 9:00 p.m., she called home again and spoke with her husband. Mr. Simonton stated that he did not go to school that day because Tate was

sick. He stated that he and Tate had been up all night and that Tate had had a fever. Mr. Simonton indicated that he thought it had broken and Tate was feeling better. Ms. Simonton told her husband that both he and Tate needed to be in school. Mr. Simonton replied, "I know. I know."

The next morning, Ms. Simonton called home a few minutes after 6:00 a.m. She wanted to call early enough so that there would be time to get Tate up and get him to school. Mr. Simonton told Ms. Simonton that Tate was still sick and they were not going to school that day. Ms. Simonton accused her husband of using Tate as an excuse not to go to work. She told Mr. Simonton that she would be home that day around 2:00 or 3:00 p.m. Sometime before 9:00 a.m., Mr. Simonton called the elementary school secretary to inform her that Tate would not be in that day.

When Ms. Simonton arrived home around 2:00 p.m. on Tuesday, Mr. Simonton met her at the back door. She noticed slimy black streaks on his face and asked what was wrong. He told her to come into the house and that Tate was dead. She then ran screaming to one of her neighbors' house, the Longs, around the corner. Hearing the screaming, Ms. Long went to the door. Ms. Simonton was very distraught and crying and told Ms. Long that her baby was dead. Ms. Long then called 911.

The 911 dispatcher informed Brian Kennon, a detective with the Marshall Police Department who was nearby, that there was a call concerning a dead baby and gave him the Simontons' address. Detective Kennon, believing that this was a SIDS death of an infant, responded to the call. After knocking on the front door, getting no response, and finding it locked, Detective Kennon proceeded to the back door. The back door was open, and as Detective Kennon began walking through the porch, Mr. Simonton opened the door to the residence. Detective Kennon identified himself and told Mr. Simonton that he needed to see the dead baby. Mr. Simonton responded, "He's back here." Detective Kennon asked Mr. Simonton to stay where he was and tell him where the baby was. When Mr. Simonton began walking towards the bedroom, Detective Kennon grabbed his elbow. Mr. Simonton jerked his arm away and kept walking. After first requesting that another officer be sent to the residence, Detective Kennon followed Mr. Simonton to the bedroom.

When Detective Kennon got to the bedroom, he saw the child lying on a waterbed. A large amount of blood was on the bed. He also observed four knives covered in what appeared to be blood, lying on a tissue box on the nightstand next to the bed. Because of the discoloration of the child's body and the odor of the room, Detective Kennon believed that the child was deceased and had been so for some time.

Mr. Simonton, who had been standing by the nightstand, then picked up one of the knives. Detective Kennon drew his service pistol, pointed it at Mr. Simonton, and told him to drop the knife or he would shoot. Mr. Simonton responded, "Don't go. I'm not going to hurt you." As Mr. Simonton began walking slowly around the bed, Detective Kennon repeated several times that Mr. Simonton should drop the knife or he would shoot. Detective Kennon noticed large cuts on both sides of his neck. Mr. Simonton would not drop the knife and kept saying, "Don't go. I'm not going to hurt you." At that point, Detective Kennon felt that Mr. Simonton was trying to get the detective to shoot him.

Around this time, Detective Kennon learned that Officer Kenneth Williams had arrived on the scene. Detective Kennon began backing out of the bedroom and

then he ran to the back door to meet Officer Williams. Detective Kennon informed Officer Williams that he thought Mr. Simonton was trying to get him to shoot Mr. Simonton, and he asked Officer Williams if he had any mace. Detective Kennon took the mace and returned his pistol to his holster while Officer Williams drew his gun. By this time, Mr. Simonton had walked to near where the officers were. Detective Kennon sprayed the mace in Mr. Simonton's direction, but Mr. Simonton was able to turn his head and avoid the mace making contact with his face.

Again, Detective Kennon asked Mr. Simonton to put down the knife. Detective Kennon and Officer Williams then followed Mr. Simonton back to the bedroom, where Mr. Simonton picked up another knife. As they followed Mr. Simonton throughout the house, Detective Kennon attempted to spray him with mace several more times. When they had returned to the dining room, Mr. Simonton was facing Officer Williams and Detective Kennon was facing Mr. Simonton's side. Detective Kennon was able to spray the mace while Mr. Simonton was not looking and made contact with the wound on Mr. Simonton's neck. Mr. Simonton angrily responded that the detective did not "have to keep macing him."

Mr. Simonton and the officers then ended up back in the bedroom, where Mr. Simonton laid the knives on the nightstand and began walking back around the bed. He stopped, made a statement to the effect that he did not think he was going to do this, and turned to walk back to where the knives were. At that point, Detective Kennon attacked him, and with the assistance of Officer Williams and Officer Clevenger, who had just arrived on the scene, handcuffed Mr. Simonton and placed him in custody.

After the scene was secure, the paramedics entered the residence and determined that Tate was dead. They then attempted to attend to Mr. Simonton's neck wounds and stab wounds to his abdomen, but he refused treatment. The paramedic was able to place a bandage on one of the wounds and then loaded him in the ambulance to transport him to the hospital. An officer who accompanied Mr. Simonton to the hospital in the ambulance asked him why he had attempted to kill himself. Mr. Simonton responded to the effect that "he didn't have a legacy now and had no reason to live[.]"

Around 2:45 p.m., the coroner arrived. The coroner determined that Tate died of acute respiratory insufficiency and determined that the death had occurred somewhere from twenty-four to thirty hours prior to that time.

During their investigation, detectives photographed the crime scene and seized several items of evidence. Detectives found a broken window in the bedroom where Tate was found. Broken glass was found in the windowsill and in trash cans in the bedroom and in the upstairs bathroom. No broken glass was found on the floor of the bedroom. Blood smears were found on the miniblinds on the window and on the wall and windowsill. Five bloody knives were recovered from the bedroom where Tate was found, four were on the nightstand and one was in the wastebasket beside the bed. Blood smears were found on the mouthpiece of the handset of the telephone located on the nightstand. Bloodstains were found at the foot of the bed, and it appeared that the blood had been wiped up or blotted. Bloody towels and washcloths were found in the laundry basket in the bedroom. Also in the bedroom, detectives found bedding and a pillow arranged in a pallet on the floor. The bedding was blood soaked, and it appeared

that someone had been lying on the pallet. In Tate's bedroom, Detective Kennon found two sets of clothes laid out on his bed.

In the den or the study of the home, Detective Kennon found a framed photograph of Tate, containing a blood smudge on the side of the frame. The detectives also found numerous documents laid neatly on a coffee table in the den. These documents included several life insurance policies and related documents and tax information. Along with this information was the yellow note pad that Ms. Simonton had used to leave instructions for Mr. Simonton regarding Tate's care while she was gone. The note pad also contained a handwritten note from Mr. Simonton to Ms. Simonton, which read as follows:

Jeanne: This is the most God-awful thing. I have no right to ask that some day you'll be able to recover from the terrible pain inflicted upon you.

I have laid Tate's master policy from United of Omaha on the table. The rider raises it to $18,000. His Pacific Corinthian was at one time First Capital Life. It's $175,000. The master copy should be in the safety deposit box, as should my master copies. The insurance list can be found on the extreme right of the desk. Liberty was at one time a different company also. I didn't want Tate to suffer for my problems with the school.

Please give Tate a standard funeral. I should have nothing like that. Please cremate me and do whatever with the remains.

I cannot believe my lamb is gone. I'm absolutely sickened. This would be the biggest of blows to you. I hope that someday you'll partially recover.

Signet Bank and the pickup payments are in the lower left drawer of the desk.

I've started a folder for 1996 taxes, and in that is our receipt for 1996 personal property taxes.

Tate and you should see each other in the next world, since you were and are good enough to get there. It goes without saying where I'll rot eternally and justifiably so.

On February 27, Detective Sergeant Thomas Bolling executed a search warrant at Mr. Simonton's school office. The purpose of the warrant was to obtain an item containing Mr. Simonton's handwriting for comparison to the note and other items found in the home. Also, detectives had learned that numerous photographs of Tate that had been in Mr. Simonton's office were no longer there. While some photographs and other material remained on bulletin boards in Mr. Simonton's office, detectives could locate no photographs of Tate.

A few weeks later, on March 12, Detective Bolling went to the Simontons' house with the chief of police after Ms. Simonton had called concerning some additional evidence. Ms. Simonton had found bloodstains on the page of a telephone book containing the listing of public schools.

An autopsy was performed on Tate by Dr. Jay Dix. Other than signs of decomposition, Dr. Dix found no external injuries on Tate's body. Dr. Dix found "a little area of bleeding" behind the esophagus. Additionally, Dr. Dix thought there was also bleeding internally on the back, right side of the scalp and a little bleeding on the top, back of the brain. Dr. Dix determined that Tate died from asphyxiation or suffocation. The bleeding in the area behind the esophagus would suggest that Tate was strangled, but Dr. Dix could not be certain that this was the method used.

Mr. Simonton was originally indicted by the Saline County grand jury for murder in the second degree. On August 19, 1998,

a subsequent grand jury indictment was filed, charging Mr. Simonton with first degree murder in the death of his son. On December 20, 1999, the State filed a substitute information in lieu of indictment, charging that Mr. Simonton, after deliberation, knowingly caused the death of Tate Simonton by asphyxiation.

A trial was held January 4–6, 2000. At trial, the only evidence presented by Mr. Simonton was the testimony of Dr. John Rabun. Dr. Rabun testified that he was contacted by the Attorney General's office to conduct a second evaluation concerning Mr. Simonton's mental state. Prior to meeting with Mr. Simonton on September 23, 1997, Dr. Rabun reviewed the police reports and witness statements, the reports of Dr. Harry, medical records from Fulton State Hospital, and records from Mr. Simonton's doctors prior to the incident. Based upon this information, Dr. Rabun concluded that Mr. Simonton "was suffering from a mental disease at the time of his son's death, and that mental disease was and still is to this day bipolar illness, also referred to as manic-depressive illness. At the time of his son's death he was in the depressed phase."

Dr. Rabun testified that Mr. Simonton's manic-depressive illness likely began in 1994 after Mr. Simonton's brother died of cancer. After that, Mr. Simonton had an episode of depression. Dr. Rabun testified that Mr. Simonton developed ideas that he was worthless, and that he wanted to kill himself. In fact, Mr. Simonton tried to hang himself in the basement. When that was unsuccessful, he took an overdose of medication, but Ms. Simonton found him. Ms. Simonton described to Dr. Rabun that at that time Mr. Simonton would lie in bed all day, but would not sleep. He was no longer attentive to his hygiene. He talked about negative things and about his worth-

lessness. He also talked about taking his life.

An example of Mr. Simonton's manic episodes, according to Dr. Rabun, occurred in 1996. He would work at school until early in the morning, such as 1 a.m., or come in very early, such as 4 a.m. He was being loud and inappropriate, and showing mood changes. Dr. Rabun testified that "[h]e was making lewd and inappropriate comments that were completely out of character, some of which were sexual in nature to the students." This behavior "led to a considerable amount of occupation dysfunction." The school ultimately placed him on leave and required that he receive psychiatric treatment before he returned. Upon the direction of the school system, Mr. Simonton began seeing Dr. Lucas, who diagnosed Mr. Simonton as having bipolar illness and prescribed medication for him. At the time of Tate's death, there was evidence that Mr. Simonton had stopped taking his medication. Dr. Rabun testified that it was not uncommon for individuals to not take medicine whether it is prescribed for a mental or physical illness.

Dr. Rabun testified that people who suffer from mental illness are not necessarily "robbed of all of [their] intelligence." He stated that "[p]eople can still think and still function, though, their ideas may be clouded by delusions." Dr. Rabun testified that in order to understand why Mr. Simonton took the life of his son, one must understand Mr. Simonton's background. When Mr. Simonton was nine years old, his father committed suicide. Dr. Rabun stated that "Mr. Simonton was ashamed of his own father's suicide, and it was a burden that he had to live with for the rest of his life[.]" At the time of Tate's death, Mr. Simonton was suicidal, believing "that his life was ruined and that he had ruined his family financially[.]" He also had been

talking more about his own father's suicide and the shame he felt. Because he did not want to leave his eight-year-old son "with the same shame that he had, ... he decided, in his deluded guilt, that he would take his son's life and then take his own." Dr. Rabun testified that "[b]ut for his depressed state, his son would be alive."

Additionally, Dr. Rabun testified concerning certain behavior exhibited around the time of Tate's death and evidence found following the incident and its relation to Mr. Simonton's mental illness. First, Dr. Rabun testified that Mr. Simonton's removal of all photographs of his son from his school office in the days preceding Tate's death suggested "that he clearly had decided that he was going to take his son's life and then take his life." He testified that this was a way of "closing the family album on both his life and his son's."

At the time of Tate's death, Mr. Simonton also exhibited certain behavior that was similar to that of his suicide attempt in 1994. In both 1994 and 1997, Mr. Simonton attempted suicide while his wife was gone. Both times, he also laid out insurance papers for her to find. Dr. Rabun testified that generally when individuals are in a depressive episode and suicidal, they often develop a plan to harm themselves. If they intend to go forward with it, they will get their affairs in order, they may write a note, and they may leave important papers for family members to find.

Dr. Rabun testified that the injuries to Mr. Simonton's neck and abdomen "[had] the appearance of a serious suicide attempt." He stated that the cuts to the neck, where both the jugular vein and carotid artery are located, were in a more lethal area than, for example, cuts to the wrist. He further testified that the injuries did not appear superficial, which is supported by the police report of a large amount of Mr. Simonton's blood in the bedroom. Dr. Rabun agreed that the evidence was consistent with Mr. Simonton having attempted to commit suicide, possibly passing out, and retrying.

Dr. Rabun testified that when the totality of the situation is considered, Mr. Simonton did not try to hide anything. He testified that although some pieces of evidence, including the evidence that there was an attempt to clean up the blood from the floor in the bedroom and his statement to Ms. Simonton that he did not do it, might suggest otherwise, the total circumstances support that he did not try to hide his actions. The fact that he did not try to hide anything supported Dr. Rabun's opinion that Mr. Simonton did not know "the wrongfulness of what he was doing." Dr. Rabun's conclusion was that while Mr. Simonton was aware of the nature and quality of his conduct, he did not know or appreciate the wrongfulness of his conduct at the time he killed Tate.

The State cross-examined Dr. Rabun regarding whether Mr. Simonton was malingering, or faking his illness. The State asked Dr. Rabun whether he was aware of Mr. Simonton's advanced training in psychology and psychiatry, including training in administering an intelligence test that Dr. Harry had performed on Mr. Simonton. While Dr. Rabun testified that he was generally aware that Mr. Simonton would have taken counseling courses since Mr. Simonton had a Master's degree in counseling, and Mr. Simonton likely would have administered intelligence tests as part of his responsibilities, Dr. Rabun was unaware of the specific courses that Mr. Simonton had taken. Additionally, the State elicited from Dr. Rabun that it was possible that Mr. Simonton knew it was wrong to kill Tate, that malingering was not uncommon in the field of forensic psy-

chiatry, and that at times one doctor will conclude that a patient is very mentally ill while another will conclude that the patient is faking. Specifically, the State asked Dr. Rabun whether it was true that, at the time he rendered his opinion, no other doctor had rendered an opinion with respect to Mr. Simonton's mental state at the time of the offense, to which he responded affirmatively. The State focused on the fact that Dr. Rabun's opinion was that of just one doctor who admitted that he could have been wrong.

The jury found Mr. Simonton guilty of first degree murder. The trial court sentenced Mr. Simonton to life imprisonment without the possibility of probation or parole in accordance with the jury's recommendation. This appeal follows.

## Trial Court Abused Its Discretion in Excluding Psychiatrist's Testimony

In his first point on appeal, Mr. Simonton argues that the trial court erred in excluding the testimony of Dr. Bruce Harry, a psychiatrist who would have testified that Mr. Simonton's mental illness prevented him from appreciating the nature, quality, and wrongfulness of his conduct. He claims that excluding the testimony as a sanction for discovery violations was erroneous because defense counsel did not violate Rule 25.05 by not informing the State and the court of Dr. Harry's testimony as soon as defense counsel learned of it. Furthermore, Mr. Simonton argues that even if Rule 25 .05 was violated, the remedy of exclusion was an abuse of discretion in that it was too harsh a remedy because the exclusion resulted in fundamental unfairness to Mr. Simonton since the testimony was material and relevant to Mr. Simonton's affirmative defense of mental disease or defect excluding responsibility.

In addressing Mr. Simonton's arguments concerning error in excluding Dr. Harry's testimony, this court must first address Mr. Simonton's argument that there was no discovery violation. In doing so, this court must consider the facts and circumstances concerning Dr. Harry's involvement in this case. After determining whether a discovery violation existed, this court must then consider whether exclusion of the testimony was error. If the record supports a discovery violation, then this court must determine whether the remedy was too harsh and an abuse of the trial court's discretion, as Mr. Simonton argues. In reviewing the propriety of the remedy imposed by the trial court, this court examines the effect of the testimony of Dr. Harry on both the State and Mr. Simonton. *State v. Kimmell,* 720 S.W.2d 790, 792 (Mo.App.1986). While this court considers the effect on both the State and Mr. Simonton, the ultimate determination of whether exclusion of the testimony was an abuse of discretion will depend on whether the court's decision "resulted in fundamental unfairness to [Mr. Simonton]." *State v.. Massey,* 867 S.W.2d 266, 270 (Mo.App.1993).

Initially, Mr. Simonton challenges that Dr. Harry's opinion concerning Mr. Simonton's mental state at the time of the offense was a discovery violation, as he did during the motion *in limine,* claiming that Dr. Harry's testimony was exempt from the disclosure requirements because Dr. Harry's opinion was not contained in a written report. Mr. Simonton cites several cases, including *State v. Cravens,* 968 S.W.2d 707 (Mo.App.1998); *State v. Enke,* 891 S.W.2d 134 (Mo.App.1994); and *State v. Rapheld,* 587 S.W.2d 881 (Mo.App.1979), for the proposition that courts have focused on the precise language in the discovery rules to find that certain nondisclosures were not in violation of the rules. The language on which he focuses states

that "material and information within [the] *possession or control*" of the other party must be disclosed. Rule 25.03(A); Rule 25.05(A) (emphasis added). Mr. Simonton claims that because Dr. Harry did not prepare a written report and his opinion was communicated at the last minute, nothing was in the possession or control of defense counsel. Thus, his opinion was exempt from the disclosure requirement.

Rule 25.05 governs disclosures by a defendant to the state upon written request. The relevant portions of this rule state:

(A) Except as otherwise provided in these Rules as to protective orders, and subject to constitutional limitations, on written request by the state, the defendant shall disclose to counsel for the state such part or all of the following material or information within his possession or control designated in such request:

(1) Any reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons, which the defense intends to introduce into evidence at a hearing or trial, except that those portions of any of the above containing statements made by the defendant shall not be disclosed;

(2) The names and last known addresses of persons, other than defendant, whom defendant intends to call as witnesses at any hearing or at the trial, together with their written or recorded statements, and existing memoranda reporting or summarizing part or all of their oral statements[.]

\* \* \*

Additionally, Rule 25.08 imposes a continuing duty to disclose on both the State and the defense. *See also, State v. Smothers,*

605 S.W.2d 128, 131 (Mo. banc 1980). This rule states:

If subsequent to complying with a request for disclosure or order of court, a party discovers information which he would have been required to disclose under the request or order, he shall furnish such additional information to opposing counsel, and if the additions are discovered during trial, the court also shall be notified.

Rule 25.08

In addition to the applicable discovery rules, §§ 552.020 and 552 .030 govern reports of psychiatrists and psychologists appointed by the court to determine the mental state of a defendant. The mental state of a defendant is relevant because § 552.020.1 provides that "[n]o person who as a result of a mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures," and § 552.030.1 provides that "[a] person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect he was incapable of knowing and appreciating the nature, quality, or wrongfulness of his conduct." Section 552.020 sets out the procedures for determination of competency to stand trial, which may include findings concerning the accused's lack of responsibility:

2. Whenever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, he shall, . . ., appoint one or more private psychiatrists or psychologists, . . ., to examine the accused[.] . . . The order shall direct that a written report or reports of such examination be filed with the clerk of the court. . . . Any examination performed pursuant to this subsection shall be completed and filed with the court

within sixty days of the order unless the court for good cause orders otherwise. . . .

Section 552.030.3 provides that if a report under § 552.020 contained "an opinion as to whether, at the time of the alleged criminal conduct, the accused, as a result of mental disease or defect, did not know or appreciate the nature, quality or wrongfulness of such accused's conduct or as a result of mental disease or defect was incapable of conforming such accused's conduct to the requirements of law," then the report prepared pursuant to § 552.020 "may be received in evidence, and no new examination shall be required by the court unless, in the discretion of the court, another examination is necessary."[2] If the § 552.020 report did not contain this information, then an examination and report to establish this opinion is ordered under § 552.030.3.

 Here, Dr. Harry was originally appointed by the court pursuant to § 552.020 shortly after Mr. Simonton was taken into custody. Dr. Harry was assigned to evaluate Mr. Simonton after he was committed to the Biggs Forensic Center of the Fulton State Hospital, where Dr. Harry was on staff. In a report filed with the court in August 1997, Dr. Harry found that Mr. Simonton was incompetent to proceed to trial. In that report, Dr. Harry stated that he could not "give an opinion [as to Mr. Simonton's mental state at the time of the charged offense] because [Mr.] Simonton's thinking [was] so slowed and muddled by his fear and depression. . . ." The judge of the associate division found Mr. Simonton incompetent to proceed to trial and ordered him committed to the

Fulton State Hospital. These findings were later adopted by the circuit judge.

In June 1998, pursuant to the requirements of § 552.020.11, the court ordered Dr. Harry to provide a status report of Mr. Simonton's condition by July 30, 1998. In its order, the court asked only that Dr. Harry provide his opinion concerning Mr. Simonton's competency to proceed, and if Dr. Harry believed that he was not competent to proceed, the probability that he would attain mental fitness to proceed in the near future. Pursuant to that order, Dr. Harry provided a status report to the court on September 28, 1998, including only his opinion that Mr. Simonton was incompetent to proceed pursuant to § 552.020, and not his opinion as to Mr. Simonton's mental state at the time of the crime pursuant to § 552.030. In that report, Dr. Harry determined that Mr. Simonton was not competent to assist in his defense, but believed that Mr. Simonton's condition would improve sufficiently within six to twelve months.

The State objected to the opinion of Dr. Harry and obtained a second evaluation by Dr. John Rabun. Following the submission of Dr. Rabun's report, Mr. Simonton was found competent to proceed to trial.

In October 1998, the State filed a request for disclosure requesting written notice of Mr. Simonton's intent to rely on the defense of mental disease or defect excluding responsibility. On January 6, 1999, Mr. Simonton responded affirmatively, but did not endorse any psychiatric or medical experts. As a result of the State's motion to compel, the court ordered Mr. Simonton to produce all discovery, including opinions and reports of anticipated defense experts,

---

**2.** It is noted that the phrase "or was incapable of conforming his conduct to the requirements of law" was deleted in 1993 from subsection 1 of § 552.030 which establishes the circumstances under which a defendant is not

responsible for criminal conduct, but the phrase remains in §§ 552.020.4 and 552.030.3 which reference opinions required to be included in reports prepared under § 552.020.

by November 19, 1999. On October 21, 1999, Mr. Simonton endorsed both Dr. Harry and Dr. Rabun as witnesses and referred the State and the court to the reports of both doctors previously filed with the court.

Prior to the defense presenting its case, the State filed a motion *in limine* to exclude the testimony of Dr. Harry. The State claimed that the testimony of Dr. Harry concerning Mr. Simonton's competency to proceed to trial was irrelevant to the issue of responsibility, and that neither Dr. Harry nor Mr. Simonton had disclosed that Dr. Harry could render an opinion on the responsibility issue. During an *in camera* hearing concerning Dr. Harry's testimony, defense counsel advised the court that she had not realized that Dr. Harry had not given an opinion regarding responsibility until she heard the prosecution mention this fact two days earlier. At the end of the first day of trial, another of Mr. Simonton's counsel called Dr. Harry and learned that he had formed an opinion regarding Mr. Simonton's mental state at the time of the offense. The trial court granted the State's motion and excluded the testimony of Dr. Harry based upon defense counsel's failure to follow discovery rules by not informing the State that Dr. Harry had reached a conclusion on Mr. Simonton's state of mind at the time of the occurrence.

Up to the time in which defense counsel learned that Dr. Harry could testify to an opinion concerning Mr. Simonton's mental state at the time of the offense, there was no discovery violation, nor was there a violation of the procedural requirements of §§ 552.020 or 552.030. With respect to the procedural requirements of §§ 552.020 and 552.030, Dr. Harry provided two re-

ports to the court pursuant to § 552.020 and court order. Those reports were filed in August 1997 and October 1998, and were provided to both the State and Mr. Simonton pursuant to § 552.020. Furthermore, on January 6, 1999, Mr. Simonton provided notice of his intent to rely on the defense of mental disease or defect, thus meeting the notice requirements of § 552.030.2.[3]

Turning to the requirements of the discovery rules, this court notes that in October 1999, Mr. Simonton endorsed Dr. Harry as a witness, thus meeting the initial requirements of Rule 25.05(A)(2). Further, there is no showing that there were any "written or recorded statements" or "existing memoranda reporting or summarizing part or all of" Dr. Harry's opinion concerning Mr. Simonton's mental state at the time of the offense, which would have been required under Rule 25.05(A)(2). *See State v. Cravens*, 968 S.W.2d at 710. Thus, having met all of the requirements of Rule 25.05(A)(2), there was no discovery violation with respect to this rule.

■ Furthermore, at the same time Mr. Simonton endorsed Dr. Harry as a witness, he also referred the State and the court to his reports previously filed with the court. At that point, Mr. Simonton had no other reports to disclose to the State. This met the requirements of Rule 25.05(A)(1).

■ The issue in this case concerns defense counsel's continuing duty to disclose under Rule 25.08 when it became aware that Dr. Harry was able to render an opinion with respect to mental state at the time of the offense and the existence of that opinion was contrary to the written

---

**3.** Section 552.030.2 prohibits the introduction of evidence of mental disease or defect excluding responsibility if notice of a defen-

dant's intent to rely on the defense is not provided.

report previously filed with the court and provided to the State. On the first day of trial, defense counsel learned that the reports previously filed with the court did not contain an opinion by Dr. Harry on the issue of responsibility. Based upon this, defense counsel contacted Dr. Harry, who informed defense counsel that he had formed an opinion with respect to Mr. Simonton's mental state at the time of the offense. At this point, defense counsel was under a duty to disclose this information to the State and the court under Rule 25.08. *See Hayes v. State,* 711 S.W.2d 876, 879 (Mo. banc 1986) (finding that State had a duty to advise defendant's counsel that plea bargain had been made with witness where prior discussion of the matter gave clear indication to the defendant's counsel that there had been no bargain). Because defense counsel did not inform the State or the court that Dr. Harry could now render an opinion with respect to Mr. Simonton's mental state at the time of the offense, which was contrary to his statement in the previous reports, defense counsel committed a discovery violation with respect to its continuing duty to disclose under Rule 25.08.

In so finding, this court gives due regard to Mr. Simonton's assertion that the opinion is not subject to discovery because it was not contained in a written report. Here, the issue is not whether the opinion was contained in a written report, but that the opinion was contrary to the beliefs of the State. The fact that the opinions of Dr. Harry were not contained in a written report can be attributed to defense counsel's mistaken belief that it was contained in the reports previously filed with the court. Having learned on the first day of trial that this belief was, in fact, incorrect, there was, arguably, insufficient time in which to prepare a written report. To excuse defense counsel's failure to disclose the fact that the existence of an opinion by

Dr. Harry when defense counsel was fully aware that this fact was contrary to the information possessed by both the court and the State would constitute a disregard for the purpose and spirit of the discovery rules and counsel's continuing duty to disclose.

■ "Rules of discovery in criminal cases 'promulgate a procedure, within constitutional definition, for mutual pre-trial disclosure between the parties in cases of felony.'" *State v. Bradley,* 882 S.W.2d 302, 306 (Mo.App.1994) (quoting *State v. Buckner,* 526 S.W.2d 387, 392 (Mo.App. 1975)). The rules, however, " 'are not mere etiquette nor is compliance discretionary.'" *State v. Willis,* 2 S.W.3d 801, 806 (Mo.App.1999) (quoting *State v. Kehner,* 776 S.W.2d 396, 397 (Mo.App.1989)). The essential purpose of these rules "is a quest for truth which promotes informed pleas, expedited trials, a minimum of surprise and opportunity for effective cross-examination." *Bradley,* 882 S.W.2d at 306 (quoting, *Buckner,* 526 S.W.2d at 392). "Rules 25.03 and 25.05 clearly intend to allow both sides to know the witnesses and evidence to be introduced at trial." *State v. Whitfield,* 837 S.W.2d 503, 508 (Mo. banc.1992). The disclosure provisions of Rules 25.03 and 25.05 are designed, in part, to eliminate surprise at trial. *See id.* (noting that Rules 25.03, 25.05, 25.07 and 25.12 "[t]aken together . . . are designed to prevent surprises"). Rule 25.08 "recognizes that certain information sought by way of discovery, . . . , may not be known when an original request for discovery is made." *State v. Davis,* 572 S.W.2d 243, 248 (Mo.App.1978) (discussing Rule 25.37, the predecessor to Rule 25.08).

While Mr. Simonton cites *State v. Enke,* 891 S.W.2d at 138, to support his argument that disclosure is not required, that case is clearly distinguishable from the facts here.

In *Enke*, 891 S.W.2d at 136–37, the defendant argued that the trial court abused its discretion in allowing the "opinion testimony" of the treating physician of a rape victim. There, the defendant claimed the physician had not been disclosed as an expert and, thus, the defense "was not prepared to rebut Dr. Elliot's opinions that it was extremely doubtful that [the victim's] injuries could have been self-inflicted, that they were less than twelve hours old, and that they were consistent with [the victim's] testimony...." *Id.* at 137. The medical records of the victim had been disclosed by the State pursuant to Rule 25.03, but did not contain the opinions to which the defendant objected. *Id.* In *Enke*, the court noted that "[t]he fact that the medical reports themselves may not have contained all of the opinions to which Dr. Elliot testified is not decisive[,]" since Rule 25.03 "does not require a summarization of a witness' testimony." *Id.* at 138.

The facts, here, present a different issue than in *Enke*. There, the conclusions and opinions of the doctor were a logical extension of and consistent with the findings contained in the medical records. Here, the issue is not of additional, consistent opinions, but concerns the fact that the existence of the opinion is contrary to the statement contained in the reports that Dr. Harry was unable to render an opinion.

Similarly, Mr. Simonton cites *State v. Rapheld*, 587 S.W.2d at 888, where the Eastern District held that there was no duty to disclose a supplemental report prepared by the pathologist, but which was never received by either party. There, the court noted that "because the report was not in the possession or control of the state, there was not duty to disclose." *Id.* There, the State, like the defense, was unaware of the existence of the report containing the modified findings. *Id.*

While the defense, here, may not have had possession of a report, it did have possession of information contrary to that contained in a previous report. Thus, the reasoning of *Rapheld* is inapplicable to this case.

 Thus, having concluded that defense counsel violated Rule 25.08 by failing to inform the court and the State of the existence of Dr. Harry's opinion, which was unknown to both and contrary to his statement in previous reports, the question now turns to whether the trial court abused its discretion in excluding Dr. Harry's testimony. The decision to impose sanctions for a violation of a discovery rule is within the sound discretion of the trial court. *State v. Hunter*, 957 S.W.2d 467, 469 (Mo.App.1997). Those sanctions may include ordering the disclosure of evidence, granting a continuance, or excluding evidence. *State v. Miller*, 935 S.W.2d 618, 623 (Mo.App.1996); Rule 25.16. This court will reverse the decision of the trial court only where the imposition of sanctions has resulted in fundamental unfairness to the defendant. *Id.*

Following the trial court's ruling on the State's motion *in limine* to exclude Dr. Harry's testimony, Mr. Simonton made an offer of proof of the excluded testimony. During the offer of proof, Dr. Harry testified that he had reviewed all of the police reports and witness statements provided to him and the records from Biggs Forensic Center. Dr. Harry also spoke with Mr. Simonton's wife and sister, and, briefly, to school personnel. Between April 1997 and July 1997, Dr. Harry conducted eight interviews with Mr. Simonton, which resulted in a total of seven hours of interview time. In August and September of 1998, Dr. Harry interviewed Mr. Simonton on three occasions for a total of 140 minutes, or almost two and one-half hours. He also administered several psychological tests.

After August 1999, Mr. Simonton was under Dr. Harry's direct care.

Dr. Harry testified that he had concluded that "while Mr. Simonton may have known the nature, quality and wrongfulness of his actions, he did not appreciate it, appreciating the sense of fully aware and fully understanding what was happening, what was going on at that time. And the lack of appreciation flowed from severe depression with psychotic features." Following the offer of proof, the trial court reiterated its prior ruling, stating that Dr. Harry's testimony was unfair surprise.

 A trial court's "refusal to allow testimony in a criminal case is a 'drastic remedy.'" *State v. Anderson*, 18 S.W.3d 11, 16 (Mo.App.2000) (quoting *State v. Mansfield*, 637 S.W.2d 699, 703 (Mo. banc 1982)). "To determine whether the exclusion of the evidence resulted in prejudice, the facts and circumstances of the particular case must be examined including the nature of the charge, the evidence presented, and the role the excluded evidence would have played in the defense's theory." *State v. White*, 847 S.W.2d 929, 932 (Mo.App.1993). "In fashioning sanctions or remedies for a discovery violation, generally the focus is the removal or amelioration of any prejudice which the State suffers due to the violation." *State v. Massey*, 867 S.W.2d at 268. Nevertheless, when fashioning remedies, the court must remember that one of the fundamental rights of due process afforded to a defendant is "the right to present witnesses in his defense[.]" *State v. Allen*, 800 S.W.2d 82, 86 (Mo.App.1990). The Supreme Court urged caution in excluding testimony of defense witnesses in *State v. Mansfield*, 637 S.W.2d at 703:

> The remedy of disallowing the relevant and material testimony of a defense witness essentially deprives the defendant of his right to call witnesses in his defense. This is not to say it should never be done, but it is certainly a drastic remedy that should be used with the utmost caution.

Guided by these principles, this court considers whether the exclusion of Dr. Harry's testimony was a proper exercise of the trial court's discretion.

This consideration involves a two-part process. First, the harm suffered by the State as a result of the late disclosure of evidence must be addressed. Once this is considered, the inquiry turns to the prejudice suffered by Mr. Simonton. "The standard by which the exclusion of testimony for failure to comply with discovery rules must be tested is whether such action resulted in fundamental unfairness to the defendant." *Massey*, 867 S.W.2d at 270.

First, the harm suffered by the State if Dr. Harry had been allowed to testify concerning his opinion of Mr. Simonton's mental state at the time of the offense without prior disclosure is considered. This is addressed in light of the purpose of the disclosure rule which was violated. As indicated above, the discovery rules are "intended to allow both sides to know the witnesses and evidence to be introduced at trial" and to eliminate surprise. *State v. Whitfield*, 837 S.W.2d at 508. Therefore, the review of the propriety of the trial court's action includes consideration of whether the State was unfairly surprised by Dr. Harry's testimony and the harm, if any, it would have suffered by virtue of that surprise.

 While the State was not given notice of Dr. Harry's opinion concerning Mr. Simonton's mental state at the time of the offense, the State was aware, in January 1999, a year before Mr. Simonton's trial, that Mr. Simonton would be proceeding with the defense of not guilty by reason of

mental disease or defect. On October 21, 1999, approximately ten weeks before trial, defense counsel disclosed Dr. Harry to the State as a possible witness. The State had copies of Dr. Harry's two previous reports that had been filed with the court.

The defense's naming of Dr. Harry as a witness ten weeks before trial alerted the State to a potential problem. The State knew that the only opinion of Dr. Harry that had been disclosed concerned Mr. Simonton's competency to stand trial, which would have been irrelevant to the issue of his guilt at trial. The State's concern over defense counsel's listing Dr. Harry as a witness when no disclosure had been made of any opinions of Dr. Harry which the State believed would be relevant at trial caused the State to file a motion *in limine*. In the State's motion *in limine*, the State raised the failure or inability of Dr. Harry to render an opinion and to supplement the report if he did develop one.

At trial, the State advised the trial court that the basis for its motion was two-fold. First, as stated in the written motion, that State argued that Dr. Harry was "in violation of the court's order of 1997" for failing to render an opinion concerning Mr. Simonton's mental state at the time of the offense. Second, the State argued that defense counsel was in violation of the court's November 19th discovery order if it had failed to provide the State with a copy of any subsequent report of Dr. Harry. The State also noted that the testimony of Dr. Harry would be cumulative of Dr. Rabun, who was also scheduled to testify for the defense and, thus, would not exclude Mr. Simonton's entire defense.

Apart from the State's argument that the testimony would have been cumulative, the two arguments raised by the State in its motion and before the court focused primarily on only the issue of whether there had been a discovery violation. This question has been answered affirmatively. A discovery violation did not occur until the time at which the defense became aware that Dr. Harry had failed to provide an opinion concerning Mr. Simonton's mental state at the time of the offense. From the arguments at the hearing on the motion *in limine*, the State's surprise in learning that Dr. Harry had, in fact, rendered an opinion concerning Mr. Simonton's mental state at the time of the offense can nonetheless be inferred. Yet, the State's argument ends there, for it did not argue how late disclosure of Dr. Harry's opinion would have impacted the State's case. *See State v. Kimmell,* 720 S.W.2d at 792. Likewise, even though the State argues in its brief that the late disclosure of Dr. Harry's opinion with respect to Mr. Simonton's mental state at the time of the offense "left no time for the State to address what was readily admitted to be a different opinion" and "deprive[d] the State of time to prepare for the new opinion," the State does not provide this court with any argument concerning the impact of the late disclosure of information.

After it learned of his opinion concerning Mr. Simonton's mental state at the time of the offense, "the [S]tate made no request to interview [Dr. Harry] before [he] testified, nor did it make any other request which would allow it to prepare for [his] appearance." *Id.* Furthermore, at trial, the State was prepared to cross-examine Dr. Rabun. In fact, the State argued that Dr. Harry's testimony would have been cumulative of Dr. Rabun's testimony. While this court believes that the testimony of Dr. Harry was not sufficiently cumulative to warrant its exclusion, which will be addressed below, the testimony was similar enough to provide the State with effective cross-examination of Dr. Harry, as well. If the State needed additional

time to prepare, it could have requested a continuance. *See id.*

This is not an instance where the defense failed to disclose the identity of a witness and, subsequently, attempted to call the witness at trial. The State was fully aware that Dr. Harry was a potential witness. Furthermore, not until after the trial had begun did the State object to Dr. Harry's testimony. *See Massey*, 867 S.W.2d at 269. The State has provided no argument concerning how its preparation for trial would have been different had it known of Dr. Harry's opinion concerning Mr. Simonton's mental state the time of the offense.

■ Having considered the harm to the State as a result of defense counsel's discovery violation, the inquiry must now turn to the prejudice suffered by Mr. Simonton in excluding Dr. Harry's testimony. In doing so, this court must consider "the facts and circumstances of [this] case . . . including the nature of the charge, the evidence presented, and the role the excluded evidence would have played in the defense's theory." *White*, 847 S.W.2d at 932. Here, Mr. Simonton was charged with first-degree murder, undoubtedly a very serious charge. Mr. Simonton's defense was not that he did not kill his son, but rather that he was suffering from a mental disease or defect that excluded his responsibility for the crime. Dr. Harry's testimony concerned the defense of not guilty by reason of mental disease or defect, in essence, the key issue at trial. Clearly, Dr. Harry's testimony was relevant and material to the defense.

■ The ultimate question for this court to determine is whether the exclusion of Dr. Harry's testimony "substantively altered the outcome of the case." *Hunter*, 957 S.W.2d at 470. The State argued at trial and in its brief, and the court concluded at trial, that Dr. Harry's testimony was cumulative of that of Dr. Rabun. A trial court has the discretion to exclude cumulative evidence. *See State v. Kobel*, 927 S.W.2d 455, 459 (Mo.App.1996). This court does not believe, however, that Dr. Harry's testimony was sufficiently cumulative to justify exclusion or that its exclusion failed to alter the outcome of the case.

The fact is that Mr. Simonton was examined by two psychiatrists who were affiliated with the State of Missouri. Dr. Harry, the first psychiatrist to see Mr. Simonton, was assigned to evaluate Mr. Simonton when he was admitted to the Biggs Forensic Center of Fulton State Hospital. Dr. Rabun, employed by the State Department of Mental Health, was chosen by the State to provide a second evaluation. Both doctors ultimately concluded that Mr. Simonton suffered from a mental disease or defect that operated to exclude responsibility for the crime charged. At trial, however, Dr. Rabun agreed that when he rendered his opinion, no other doctor had rendered an opinion on the issue of Mr. Simonton's mental condition at the time of the offense. While this was technically true since Dr. Harry's opinion on this issue came later in the process, the jury was nonetheless left with the impression that only Dr. Rabun concluded that Mr. Simonton's mental state excluded his responsibility for the crime.

Further, the State attempted to discredit Dr. Rabun's testimony, and thus Mr. Simonton's defense, by suggesting that Mr. Simonton was malingering, or faking his illness. On cross-examination, the State asked Dr. Rabun whether he was aware of Mr. Simonton's advanced training in psychology and psychiatry, including training in administering an intelligence test that Dr. Harry had performed on Mr. Simonton. While Dr. Rabun testified that he was generally aware that Mr. Simonton

would have taken counseling courses since Mr. Simonton had a Master's degree in counseling, and Mr. Simonton likely would have administered intelligence tests as part of his responsibilities, Dr. Rabun was unaware of the specific courses that Mr. Simonton had taken.

Additionally, on cross-examination, the State elicited from Dr. Rabun that it was possible that Mr. Simonton knew it was wrong to kill Tate, that malingering was not uncommon in the field of forensic psychiatry, and that at times one doctor will conclude that a patient is very mentally ill while another will conclude that the patient is faking. The State focused on the fact that Dr. Rabun's opinion was that of just one doctor who admitted that he could have been wrong. Adding the opinion of a second doctor who also concluded that Mr. Simonton was mentally ill at the time of the offense could reasonably have dispelled any concerns the jury might have had that Mr. Simonton was faking his illness through the use of the skills he acquired during his training as a counselor.

Additionally, the substance and nature of Dr. Harry's testimony, apart from its benefit in supporting the conclusions of Dr. Rabun, could have likely been more persuasive to the jury. Dr. Harry's opinions and conclusions resulted from more significant contact with Mr. Simonton. Dr. Harry was the first psychiatrist to meet with Mr. Simonton. During 1997 and 1998, Dr. Harry interviewed Mr. Simonton eleven times, for a total of almost nine and one-half hours. From August 1999 until the time of trial, Mr. Simonton had been under Dr. Harry's direct care. Dr. Rabun, however, met with Mr. Simonton only twice, once in September 1997 and then again in October 1998, for a total of about four hours.

While both doctors' opinions came from basically the same information—police reports, witness statements, and Dr. Harry's reports—both had relevance independent of each other. As Mr. Simonton points out in his brief, the doctors' ultimate conclusions were somewhat different. Mr. Simonton's defense was based on the provision in § 552.030.1, RSMo 1994, which provides that "[a] person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect he was incapable of knowing and appreciating the nature, quality or wrongfulness of his conduct." Dr. Rabun concluded that Mr. Simonton was aware of the nature and quality of his conduct, but did not know and appreciate the wrongfulness of his conduct at the time he killed Tate. Yet when asked on cross-examination, Dr. Rabun agreed that at the time of the offense Mr. Simonton "[knew] that it was wrong to kill people[,]" in general, but he killed Tate anyway.

Dr. Harry testified in the offer of proof, however, that, while at the time of the offense Mr. Simonton may have known the nature, quality and wrongfulness of his actions, Mr. Simonton did not appreciate the nature, quality, and wrongfulness of his actions, "appreciating the sense of fully aware and fully understanding what was happening, what was going on at that time." While the distinction between the two conclusions may appear slight, the impact on the jury could have made a difference in its determination. Although some of the testimony of the two doctors may have been "cumulative and corroborative[,]" this court believes that Dr. Harry's testimony "was of greater significance[ ]" and certainly could have impacted the outcome of the case. *State v. Dethrow*, 674 S.W.2d 546, 549 (Mo.App.1984).

The testimony of both doctors, and especially that of Dr. Harry, was a significant part of Mr. Simonton's ability to present witnesses in his defense. *See Allen*, 800

S.W.2d at 86. The Supreme Court has recognized the significance of psychiatric or psychological testimony when the defendant's mental state is in question. *State v. Carter*, 641 S.W.2d 54, 58–59 (Mo. banc 1982). In *Carter*, the Supreme Court upheld the trial court's order requiring disclosure of the report of a psychiatrist obtained by the defense who had "concluded that defendant was not suffering from a mental disease or defect excluding criminal responsibility." *Id.* at 56. While defense counsel had chosen not to call the psychiatrist based upon his findings, the State sought disclosure of the report under Rule 25.06(A), which allows for disclosure of material or information not covered under Rule 25.05 upon a finding by the court that the request is reasonable and the "information sought is relevant and material to the State's case." *Id.* at 58. There, the Court noted that "[p]ublic policy considerations weigh[ed] heavily in favor of disclosure under the circumstances of [that] case." *Id.* As is the case here, the Court in *Carter* stated that "[t]here is no question that defendant committed a brutal homicide under highly incriminating circumstances[.] [T]he only live and vital question for decision by the jury was whether defendant was mentally responsible for his acts ." *Id.* The Court continued by stating the following:

> The fundamental purpose of a criminal trial is the fair ascertainment of the truth. *People v. Sorna*, 276 N.W.2d 892, 895[4] (Mich.App.1979). The jury needed every bit of available evidence touching that issue in order to render an intelligent, fair and just verdict. Not only the defendant, but also the State of Missouri, has a direct interest in an accurate, just and informed verdict based upon all available relevant and material evidence bearing on the question. The trier of the fact must not be "so effectively deprived of valuable witnesses as to undermine the public interest in the administration of justice." *Pouncy v. Florida*, 353 So.2d 640, 642 (Fla.App.1977). In *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038 (E.D.N.Y.1976), ..., the court at 1046 referred to "The increased potential for inaccuracy in the truth-finding process as the trier of fact is deprived of valuable witnesses," and referred to the salutary concept that "the trier of fact should have adequate access to as much of the available psychiatric testimony as possible where the defendant's mental state is in issue." *Id.* at 1049.

*Carter*, 641 S.W.2d at 58–59.

At trial, the State attempted to discredit Mr. Simonton's claim of mental disease or defect excluding responsibility by arguing that he was malingering. The State even argued in closing argument that the jury "shouldn't fall in a trap of psychological mumbo jumbo to provide an excuse for killing a child." The testimony of a second physician, one who saw Mr. Simonton more often, may likely have impacted the juror's perception of whether Mr. Simonton's defense was "mumbo jumbo" and whether he was, in fact, faking a mental illness. There is simply "no way of knowing what reaction the jury would have had" to this evidence that was "vital and integral" to his defense. *State v. Bashe*, 657 S.W.2d at 321, 325 (Mo.App.1983).

Here, the prejudice to Mr. Simonton considering the importance of Dr. Harry's testimony with respect to Mr. Simonton's defense and the seriousness of the charge in this case is great. The prejudice to the State, however, was minimal and could have been relieved by less drastic means. Thus, this court finds that the trial court abused its discretion in excluding Dr. Harry's testimony. While exclusion of testimony is appropriate in some circumstances, the exclusion in this case was too

drastic a remedy. The trial court should have fashioned some other remedy to alleviate any harm to the State, while at the same time protecting Mr. Simonton's right to present such a vital witness to his defense. *See Mansfield,* 637 S.W.2d at 703.

This court's determination that the trial court abused its discretion in disallowing Dr. Harry's testimony thereby resolves the issue presented by Mr. Simonton's second point on appeal, in which he claims that Dr. Harry should have been allowed to testify to his opinions concerning Mr. Simonton's mental conditions at the time of the second evaluation. Likewise, this court need not address Mr. Simonton's third point, regarding alleged error in closing arguments, since this case will be remanded for new trial and it is unlikely that the issues presented in this point will occur on retrial.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

All concur.